AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
MAY 13 2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____rsm_____ DEPUTY

United States of America

v.

TONY RAY LOUDEN,

Defendant

Case No. **2:24-mj-02815-DUTY**

**FILED**
CLERK, U.S. DISTRICT COURT
May 13, 2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____CLD_____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 21, 2024, in the county of Los Angeles in the Central District of California, the

defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearm and Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Elizabeth Cardenas*
*Complainant's signature*

Elizabeth Cardenas, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  May 13, 2024
_____
*Judge's signature*

City and state:  Los Angeles, California
Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: Brandon E. Martinez-Jones, x7167

## <u>AFFIDAVIT</u>

I, Elizabeth Cardenas, being duly sworn, declare and state as follows:

## I.   <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Tony Ray LOUDEN ("LOUDEN") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and Ammunition.

2.   This affidavit is also made in support of an application for a warrant to search a black Samsung cellular phone (the "SUBJECT DEVICE"), as described more fully in Attachment A.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of firearm and ammunition); 18 U.S.C. § 924(c) (possession of firearm during a drug trafficking crime); 21 U.S.C. § 841 (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of communications facilities to facilitate the distribution of controlled substances); 21 U.S.C. § 846 (conspiracy to distribute controlled substances); and 21 U.S.C. § 856 (maintaining a place for the manufacture, distribution, or use of controlled substances) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2019.  I am currently assigned to the Los Angeles Field Division Long Beach Resident Agency, which is responsible for investigating violent crimes within the Long Beach Resident Agency's area of responsibility.

5.   I have received formal training at the FBI Training Academy in Quantico, Virginia.  This training included segments on conducting criminal investigations, narcotics identification, organized crime, and other law enforcement topics.  During the time I have been employed by the FBI, I have participated in investigations relating to firearms trafficking, drug trafficking, crimes against children, kidnapping, extortion, criminal threats, bank robberies, Hobbs Act robberies, murder-for-hire, and other violent crimes.  I have participated in many aspects of criminal investigations, including, but not limited to, reviewing evidence, the issuance of subpoenas, the analysis of pen and trap and trace records, consensually monitored telephone calls, conducting physical and electronic

surveillance, working with informants, and the execution of
search and arrest warrants.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On March 21, 2024, Long Beach Police Department
("LBPD") officers conducted a traffic stop of a car driven by
LOUDEN for traffic violations.

7.   As officers approached LOUDEN's car, LOUDEN opened the
front driver's door of the vehicle, at which point officers
observed suspected narcotics in plain view inside the car,
including a vial of suspected phencyclidine.

8.   Officers then searched the vehicle and found various
types of suspected narcotics, loose United States currency, a
dagger hidden under a mat on the driver's floorboard, a loaded
revolver in a bag on the floor behind the front passenger seat,
and a box of twenty 5.56 caliber rounds of ammunition underneath
the front passenger seat.

9.   LOUDEN is a convicted felon with 2004 California
felony convictions for possession of a controlled substance
while armed and possession of a firearm by a felon.

10.   The gun found in LOUDEN's car was a .38 Special Colt
revolver and was loaded with six rounds of live ammunition.  The
gun and these six rounds of ammunition were manufactured outside
of California and thus must have traveled in interstate
commerce.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    LBPD Officers Conduct Traffic Stop on LOUDEN**

11.    Based on my review of reports prepared by LBPD Officer Jordan Lasch, my review of bodyworn-camera footage, and my own knowledge of this investigation, I know the following:

a.    At approximately 1:00 A.M. on March 21, 2024, LBPD Officers Lasch and Jeremy Gil were working uniformed patrol in a marked black-and-white police vehicle in the city of Long Beach, California, when they observed a black Chevrolet Tahoe bearing California license plate number ending in 658 (the "Black Tahoe") commit multiple traffic violations.

b.    Specifically, the Black Tahoe was driving at a speed greater than fifty miles per hour in an area with a posted speed limit of thirty-five miles per hour.  The officers attempted to catch up to the Black Tahoe to conduct a traffic stop.  As the Black Tahoe approached Willow Street, the driver failed to activate the Black Tahoe's turn signal one hundred feet prior to making a lane change, in violation of California Vehicle Code § 22108.  The Black Tahoe then made a right turn into a parking lot at the northeast corner of Pacific Avenue and Willow Street, and the driver once again failed to activate their turn signal one hundred feet prior to making the turn in violation of California Vehicle Code § 22108.

c.    The Black Tahoe pulled into a parking space in front of a 7-Eleven convenience store located at 2600 Pacific Avenue in Long Beach.  Officers Lasch and Gil stopped their police vehicle behind the Black Tahoe and activated their car's

forward-facing red lights and siren to conduct a traffic stop. Officer Lasch exited the police vehicle and walked toward the driver's side of the Black Tahoe.

d.    As Officer Lasch approached the Black Tahoe's driver's side, a man later identified as LOUDEN opened the Black Tahoe's front driver's side door.  Officer Lasch contacted LOUDEN and advised him of the reasons for the traffic stop.  As Officer Lasch spoke with LOUDEN, Officer Lasch noticed a glass bottle in a visible storage area in the panel of the front driver's side door of the Black Tahoe, containing what appeared to be an amber liquid.  Officer Lasch recognized this item to be a bottle of phencyclidine, or "PCP," and detained LOUDEN pending further investigation.  Officer Gil noticed other narcotics in plain view within the Black Tahoe's front compartment.

e.    The officers escorted LOUDEN away from the Black Tahoe and to the front of the police vehicle.  While patting down LOUDEN, Officer Lasch noticed that LOUDEN was wearing what appeared to be a bulletproof vest underneath his jacket.  There were no other passengers inside the Black Tahoe.

f.    With the assistance of other LBPD officers who arrived at the scene, Officers Lasch and Gil conducted a search of the Black Tahoe.  The officers found the following items (among others) inside the Black Tahoe:

i.    On top of the vehicle's center console, eight individually packaged plastic baggies containing off-white, rock-like substances, believed to be crack cocaine;

ii.  On top of the vehicle's center console, two larger plastic baggies containing an off-white substance believed to be crack cocaine;

iii. On top of the vehicle's center console, near the front cup holder, fifteen plastic baggies containing a white crystalline substance believed to be methamphetamine;

iv.  On the floorboard of the front driver's seat, a plate with two razor blades and an off-white, rock-like substance on it, believed to be crack cocaine;

v.   In the front driver's side door, a glass vial containing an amber liquid believed to be PCP;

vi.  Inside the center console, an unmarked pill bottle containing three black heart-shaped pills suspected of containing an unknown narcotic substance;

vii. Inside the center console, three cylindrical tubes containing a green leafy substance believed to be marijuana;

viii.    Concealed beneath the mat on the floorboard of the driver's seat, one dagger with a five-inch blade;

ix.  On top of the center console, a black Samsung cellphone--*i.e.,* the SUBJECT DEVICE;

x.   Inside the center console, $477.00 in miscellaneous U.S. currency;

xi.  In a blue bag on the floorboard behind the front, righthand passenger seat, a .38 Special Colt Cobra Revolver bearing serial number 206623.  This revolver was loaded

with three Winchester .38 caliber cartridges, two Federal Brand

.38 caliber cartridges, and one R-P .38 caliber cartridge; and

xii. Underneath the front passenger seat, a box

of twenty Frontier Brand 5.56 caliber cartridges.

g.   Photographs of some of the items found in the

Black Tahoe, including the revolver, dagger, and the SUBJECT

DEVICE, are attached below:





12.   These items were subsequently booked into LBPD custody.

**B.   LOUDEN's Criminal History**

13.   Based on my review of certified conviction records, I learned that LOUDEN has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:  On or about May 3, 2004, LOUDEN was convicted of possession of a controlled substance while armed in violation of California Health & Safety Code § 11370.1(a) and possession of a firearm by a felon in violation of California Penal Code § 12021(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number NA060544.

14.   Based on my review of a criminal-history report for LOUDEN, I know that he also has the following criminal history:

a.   In or about October 1991, LOUDEN was arrested as a juvenile for robbery in the first degree in violation of California Penal Code § 211;

b.   In or about October 1991, LOUDEN was convicted of carrying a concealed weapon in a vehicle in violation of California Penal Code § 12025(a);

c.   In or about October 1992, LOUDEN's probation was revoked in connection with a charge of receiving stolen property in violation of California Penal Code § 496, among other offenses;

d.   In or about August 2009, LOUDEN was found to have violated his parole in connection with an arrest for selling marijuana or hash in violation of California Penal Code § 11360

and possessing marijuana for sale in violation of California;
and

        e.   In or about May 2018, LOUDEN was convicted of
domestic violence in violation of California Penal Code
§ 273.5(a) and, as a condition of probation, was restricted from
possessing firearms.

        **C.**   **Interstate Nexus**

   15.  Based on my review of an April 15, 2024, report
prepared by FBI Special Agent ("SA") Paul Sanchez, I know that
SA Sanchez, who is an ATF Interstate Nexus Expert, examined the
revolver and ammunition found in the Black Tahoe and confirmed
that the revolver is a firearm and that both the firearm and
ammunition were manufactured outside of the State of California.
Because the firearm and ammunition were found in California, I
believe that they have traveled in and affected interstate
commerce.

        **D.**   **There is Probable Cause to Believe That Evidence of
the SUBJECT OFFENSES Will Be Found on the SUBJECT
DEVICE**

   16.  From my training, personal experience conducting
firearms and drug-trafficking investigations, and the collective
experiences related to me by other law enforcement officers who
conduct who also conduct such investigations, I am aware of the
following:

        a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.

b.   Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

c.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  These records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

d.   Communications between people buying and selling drugs take place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.

e.   This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.

f.   In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

g.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of

meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

h.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

i.    Persons who illegally possess, purchase, or sell firearms, including machineguns, often store firearms, prohibited items, and evidence of possession and sale on their person, in their residence, and in vehicles that they control.

j.    Persons who illegally possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future sales, purchases, or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

k.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.  These may

include recordings or photographs that may reveal both that a person has possessed a particular firearm or ammunition (e.g., photographs of them holding a particular firearm) and also that person's knowledge of the firearm's characteristics and functionalities (e.g., videos of them firing a firearm). Digital devices containing such evidence are often kept on the person.

l.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale or possession of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.  These communications may include information or references that tend to establish a person's knowledge of a firearm's characteristics and functionalities (e.g., text or social-media messages describing whether a firearm is semi-

automatic or equipped with a device that renders it capable of fully automatic fire).  Digital devices containing such evidence are often kept on the person.

        m.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices to conceal their identities when engaging in firearms transactions and to make detection and identification by law enforcement more difficult.  Individuals engaged in such illegal firearms transactions often carry one or more digital devices with them so that they are able to stay in frequent communication with potential suppliers or customers.

    17.  Based on all the above facts, I submit that there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found on the SUBJECT DEVICE.  For example, text messages, social-media messages, and/or photographs on the SUBJECT DEVICE may tend to show that LOUDEN knew that he unlawfully possessed the .38 Special Colt revolver found in the Black Tahoe and may reflect his participation in drug trafficking, the identities and involvement of his drug-trafficking customers and co-conspirators, the identities of his sources of supply, and locations where he may keep, conceal, or distribute drugs.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

18.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has

---

[1] As used herein, the term "digital device" includes the
SUBJECT DEVICE and any electronic system or device capable of
storing or processing data in digital form, including central
processing units; desktop, laptop, notebook, and tablet
computers; personal digital assistants; wireless communication
devices, such as paging devices, mobile telephones, and smart
phones; digital cameras; gaming consoles; peripheral
input/output devices, such as keyboards, printers, scanners,
monitors, and drives; related communications devices, such as
modems, routers, cables, and connections; storage media; and
security devices.

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

19. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>CONCLUSION</u>

21.  For all of the reasons described above, I submit that there is probable cause to believe that LOUDEN has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and Ammunition.  I further submit that there is also probable cause to believe that the items to be

//

//

seized described in Attachment B will be found in a search of

the SUBJECT DEVICE as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>13th</u> day of May,
2024.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE